## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-62370-CIV-ALTMAN/Hunt

**CHARLA GOODNIGHT**,

    *Plaintiff*,

v.

**BOSTON SCIENTIFIC
CORPORATION**,

    *Defendant*.

_____/

### ORDER

Before the Hon. Roy K. Altman:

This lawsuit arises from alleged defects in the Defendant's transvaginal surgical mesh—a product that, in 2014, was implanted into the Plaintiff to treat her stress-urinary incontinence. Now, more than a year into this litigation—and six months after the expiration of the Court's dispositive-motions deadline—the Defendant argues, for the first time, that the Plaintiff's punitive-damages claim should be governed (and precluded) by Massachusetts law. Up to this point, though, *both* parties have briefed the case's substantive and procedural questions under *Florida* law. The Defendant did, to be fair, in its Answer to the Complaint, plead "all defenses" and "all applicable statutory damages caps" under the laws of "each and every state with respect to any claims for punitive damages." But this capacious and boilerplate preservation language cannot save the Defendant here, given both the positions it took in its briefs and its implicit acknowledgment that *Florida* law should govern all issues in the case.

The Defendant offers no excuse for the (extreme) tardiness of its choice-of-law Motion—which, in every practical effect, functions as a second motion for partial summary judgment. Nor can it. After all, each of the facts—and all the legal authorities—it cited in the Motion were available to the Defendant even before this case began. Six years ago, when it was facing thousands of lawsuits in a multidistrict litigation ("MDL") with which this case is associated, the Defendant made the *very same argument* it advances here: that Massachusetts law foreclosed the plaintiffs' punitive-damages claims. It even raised this precise argument against a group of plaintiffs who—like the Plaintiff here—lived in Florida, were implanted with a mesh product in Florida, and suffered injuries in Florida.

That strategy didn't work six years ago, and it doesn't work today. The Defendant's wholesale inability to cite *any* new facts or binding legal authority is fatal on two fronts. *First*, it shows that the Defendant had no justifiable reason to wait until now to file this Motion. If it did plan to push its (once-rejected) choice-of-law argument again, it could have (and should have) done so at summary judgment. *Second*, and most obviously, it indicates that the Defendant's choice-of-law argument fails (as it always has) on the merits. The Defendant hasn't even tried to distinguish the prior MDL decisions. Nor has it given the Court any compelling reason to deviate from their outcomes. And so, because it is both too little and too late, the Motion Regarding Choice of Law for Punitive Damages (the "Motion") [ECF No. 100] is **DENIED**.

## BACKGROUND

In 2012, the Judicial Panel on Multidistrict Litigation consolidated thousands of vaginal-mesh cases from all fifty states and assigned them to the Honorable Joseph R. Goodwin, United States District Judge for the Southern District of West Virginia. *See In Re: Am. Med. Sys., Inc., Pelvic Repair Sys. Prods. Liab. Lit.*, 844 F. Supp. 2d 1359 (J.P.M.L. 2012). Approximately 26,000

of these cases were filed against Boston Scientific Corporation ("BSC")—a manufacturer of transvaginal surgical mesh and the Defendant here. *See In Re: Bos. Sci. Corp., Repair Sys. Prods. Liab. Lit.*, MDL No. 2326 (S.D. W. Va.) ("MDL 2326").

Amal Eghnayem and three other Florida residents filed separate lawsuits against BSC directly in MDL 2326, alleging both that they had been implanted with a BSC device called the "Pinnacle Pelvic Floor Repair Kit" and that certain defects in the mesh caused them to suffer some (pretty) serious medical complications. *See Eghnayem v. Bos. Sci. Corp.*, 2014 WL 5386731, at *1–2 (S.D. W. Va. Oct. 21, 2014). All four alleged that they had been implanted with the device in Florida and that their injuries occurred here. *Id.* Judge Goodwin consolidated their cases, and BSC eventually moved for summary judgment. *Id.* at *1 & n.2.

At summary judgment, BSC argued (as relevant here) that, under Florida's choice-of-law rules, Massachusetts law governed (and precluded) the *Eghnayem* Plaintiffs' punitive-damages claims. *Id.* at *2. In support, BSC noted that its management team for Urology and Women's Health was located in Massachusetts and, accordingly, contended that "the conduct allegedly giving rise to the punitive damages claims occurred in Massachusetts." *Id.* at *4. Judge Goodwin disagreed and determined that Massachusetts did *not* have a more "significant relationship" to the claim than Florida did. *Id.* at *5. Florida law, Judge Goodwin concluded, would thus govern the application of punitive damages. *Id.*

This decision was no mere aberration. Just two months earlier, Judge Goodwin had arrived at the same conclusion in *Sanchez v. Bos. Sci. Corp.*, 38 F. Supp. 3d 727, 731 (S.D. W. Va. 2014)— a vaginal-mesh case in which BSC had advanced a (substantially) similar choice-of-law argument against a California plaintiff. In *Sanchez*, as in *Eghnayem*, BSC failed to provide any "Massachusetts legal authority supporting its proposition that Massachusetts has an interest in

protecting its citizens from excessive liability, let alone liability for wrongs occurring outside of Massachusetts," and Judge Goodwin himself was "unable to locate any Massachusetts cases articulating the state's interest in prohibiting punitive damages at common law." *Id.* at 739. Indeed, BSC's inability to substantiate Massachusetts's interest in limiting the company's exposure to punitive damages was fatal to its choice-of-law strategy in still another case. *See Adams v. Bos. Sci. Corp.*, 2015 WL 5882980, at *5 (S.D. W. Va. Oct. 7, 2015) (finding that Texas, rather than Massachusetts, law applied under Texas's version of the "significant relationship" test).[1]

After summary judgment, Judge Goodwin transferred *Eghnayem* to the Southern District of Florida for trial on all remaining claims, including punitive damages. *See Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1310 (11th Cir. 2017). A federal jury in this District returned a verdict in favor of the plaintiffs on all counts, except for punitive damages, and awarded each of them more than $6 million. *Id.* at 1312. BSC appealed, and the Eleventh Circuit affirmed. *Id.* at 1324.

\*\*\*

In 2014, while the MDL cases were proceeding in West Virginia, Charla Goodnight was in Naples, Florida, having a BSC "Advantage Fit" surgically implanted to treat her stress-urinary incontinence. Four years later, in 2018, she filed this lawsuit, in which she claims that defects in the product required her to undergo reparative surgeries and caused her significant physical and emotional injuries. *See* Plaintiff's Amended Complaint ("Complaint") [ECF No. 9] ¶¶ 52, 54–55. In Count V of the Complaint, Ms. Goodnight seeks punitive damages for BSC's allegedly willful

---

[1] Judge Goodwin also rejected BSC's choice-of-law argument in cases where the originating jurisdiction followed the *lex loci delicti* rule. *See Hendricks v. Bos. Sci. Corp.*, 51 F. Supp. 3d 638, 642 (S.D. W. Va. 2014) (concluding that West Virginia, not Massachusetts, law applied to a punitive-damages claim under West Virginia's *lex loci delicti* rule); *Holizna v. Bos. Sci. Corp.*, 2015 WL 2452483, at *3 (S.D. W. Va. May 21, 2015) (coming to the same conclusion under Georgia law).

and malicious conduct in selling and marketing a product it knew to be unreasonably dangerous. *Id.* ¶¶ 75–84.[2]

Early in the litigation, this Court issued a scheduling order that required the parties to file all pre-trial motions—including motions for summary judgment—by August 23, 2019. *See* Scheduling Order [ECF No. 23]; Paperless Order Extending Summary-Judgment Deadline [ECF No. 36]. BSC timely moved for summary judgment—but only as to Counts III and IV of the Complaint. *See* BSC's Motion for Summary Judgment [ECF No. 44] at 1–2. It did not—as pertinent here—move for judgment against the punitive-damages claim (Count V). Nor (significantly) did it argue that Massachusetts law governed *any* aspect of the case. *See generally id.* The Court granted in part and denied in part BSC's Motion for Summary Judgment—dismissing only Count III. *See* Summary Judgment Order [ECF No. 93] at 8.

The Court then extended the deadline for the parties to file proposed jury instructions and pre-trial stipulations to December 20, 2019. *See* Amended Scheduling Order [ECF No. 57] at 1. On that day, both parties timely filed a joint set of proposed jury instructions. *See* Joint Proposed Jury Instructions [ECF No. 83]. That filing included an instruction on punitive damages—which, both sides agreed, should be governed by Florida law. *See id.* at 55–56. BSC also moved to bifurcate the trial so that a jury would first determine liability (and the Plaintiff's entitlement to

---

[2] Ms. Goodnight had filed an initial complaint [ECF No. 1], which BSC moved to dismiss. *See* BSC's Motion to Dismiss [ECF No. 7]. BSC premised its dismissal arguments—including its arguments for dismissal of the punitive-damages claim—on Florida, not Massachusetts, law; BSC, in fact, never mentioned Massachusetts law (or any other choice-of-law issue) at all. *See id.* at 17 ("As the Florida Supreme Court has made clear, punitive damages may not be awarded in the absence of a finding of liability for compensatory damages."); *see also id.* at 2 ("Plaintiff's negligence claim is littered with duties of care that are not recognized as independent causes of action under Florida law."). When the Plaintiff amended her complaint, the Court denied the Motion to Dismiss as moot, *see* Order [ECF No. 10], and BSC never moved to dismiss the now-operative amended Complaint. *See generally* Docket.

5

punitive damages) and then, in a second phase—and only if necessary—quantify *the amount* of those punitive damages. *See* BSC's Motion to Bifurcate [ECF. No. 77] at 1–2. In support, BSC explained that bifurcation would be "[c]onsistent with the Florida Supreme Court's holding in *W.R. Grace & Co.–Conn. v. Waters*, 638 So. 2d 502, 506 (Fla. 1994)." *Id.* Again, in its Motion to Bifurcate—which the Court granted, *see* Bifurcation Order [ECF No. 101]—BSC never referred to Massachusetts law.

On February 14, 2020—six months after summary judgment and two months after the jury-instruction deadline—BSC filed this Motion, in which it claimed, for the first time, that Massachusetts law precluded Ms. Goodnight's punitive-damages claim. [3] BSC's primary contention is that, since it's headquartered in Massachusetts—and because it made decisions about the Advantage Fit there—Massachusetts has a stronger interest than Florida in the application of punitive damages. *See* Motion at 1–5 (arguing that, because punitive damages are intended to punish and deter wrongful conduct, the state in which an allegedly defective product was designed has a superior interest); Reply at 6 (suggesting that Massachusetts has an interest in protecting BSC from excessive liability). And here's the best part (at least from BSC's perspective): Massachusetts *prohibits* punitive damages "unless expressly authorized by statute." Motion at 6–7 (quoting *Flesner v. Tech. Commc'ns Corp.*, 575 N.E.2d 1107, 1112 (Mass. 1991)). What's worse, even when "authorized by statute," punitive damages are unavailable in Massachusetts *unless* the plaintiff sends the defendant a demand letter thirty days before filing suit. *See id.* at 7 (citing MASS. GEN. LAWS ANN. Ch. 93A, § 9(3)). And so, BSC says, because Ms. Goodnight did not assert a cause of action under Massachusetts's consumer-protection statute or send the

---

[3] The Motion is now ripe. *See* Plaintiff's Response in Opposition to Defendant's Motion Regarding Choice of Law for Punitive Damages ("Response") [ECF No. 103]; BSC's Reply in Support of Motion Regarding Choice of Law for Punitive Damages ("Reply") [ECF No. 104].

necessary demand letter, the Court should enter judgment on her punitive-damages claim. *See id.* at 6–8.

On the all-important question of timeliness, BSC points out that the parties never squarely presented the choice-of-law question to the Court—and, it adds, BSC did not "intentionally" wait to gain an unfair advantage. *See id.* at 5. Finally, nodding (or winking) at equitable principles, BSC insists that an order granting its Motion would promote judicial economy *without* unfairly surprising or prejudicing Ms. Goodnight. *See id.* at 5–6; Reply at 3–5.

## THE LAW

District courts have substantial discretion to reject motions filed after the expiration of court-imposed deadlines. *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011) ("[W]e have often held that a district court's decision to hold litigants to the clear terms of its scheduling orders is not an abuse of discretion."). And that discretion extends to untimely choice-of-law motions. *See Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 72 (1st Cir. 2006) (collecting cases in which district courts "either permitted or forbade a party from raising a choice-of-law argument late in the proceedings," and explaining that, because there's no "definitive point by which a litigant must raise a choice-of-law argument," a district court may reject a late-filed motion based on "the case's own facts and equities").

Unlike subject-matter jurisdiction—which a court must *always* consider, and which can neither be waived nor acceded to—the parties can stipulate to (or waive) the law that will govern the various claims or issues in a federal diversity case. *See Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998) (affirming the denial of a Rule 59 motion, which was based on a choice-of-law argument where, "[a]t all pertinent times before the order of dismissal, the district court was asked to look at Florida law"). In *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904

F.3d 1197 (11th Cir. 2018), for example, the Eleventh Circuit held that the plaintiff had waived its opportunity to apply non-Florida law to the insurance policies at issue in that case. In so doing, the court explained that, "[u]nder our precedents, a party waives its opportunity to rely on non-forum law where it fails to timely provide—typically in its complaint or the first motion or response when choice-of-law matters—the sources of non-forum law on which it seeks to rely." *Id.* at 1208. Because the plaintiff had failed to plead any non-forum law—and given that the plaintiff "seemed quite content early in the litigation with the application of Florida law"—the district court was "entitled to assume" that Florida law applied. *Id.* at 1208–09. Notably, the Eleventh Circuit rejected the plaintiff's contention that its "general references to a choice-of-law analysis in opposition to [the defendant's] dispositive motions" somehow preserved its later choice-of-law assertions. *Id.* at 1209.[4]

In deciding whether to address late-filed motions, courts may evaluate whether doing so "would be the course of action most consistent with the interest of judicial economy." *Thomas v. Kroger Co.*, 24 F.3d 147, 149 (11th Cir. 1994) (quoting *Matia v. Carpet Transport, Inc.*, 888 F.2d 118, 119 (11th Cir. 1989)). They may also consider whether the late filer had a valid reason or

---

[4] The Eleventh Circuit is not alone in allowing parties to waive their choice-of-law arguments. *See, e.g.*, *Shay v. Walters*, 702 F.3d 76, 80 (1st Cir. 2012) ("Where the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent choice of law analysis and accept the parties' agreement." (cleaned up) (quoting *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991))); *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 (2d Cir. 2001) ("The parties' briefs assume that New York substantive law governs the issues of contract interpretation and statute of limitations presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law."); *Wood v. Mid–Valley, Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue[,] the federal court simply applies the law of the state in which the federal court sits."); *see also* 19 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 4506 (3d ed. Oct. 2020 update) ("[S]everal courts have held that the district court judge may forgo an independent choice-of-law analysis if the parties have agreed, either expressly or tacitly, as to which state's laws should control their case.").

excuse for its delay. *See Chacon v. El Milagro Child Care Ctr.*, 2009 WL 1920151, at *2 (S.D. Fla. July 2, 2009) (striking a late-filed motion for summary judgment where the movant's delay was "inexcusable"). Finally, courts should weigh the equities, not only for the parties, but also for the general public, which may be "affected by the court's increasingly crowded docket." *Young v. City of Palm Bay*, 358 F.3d 859, 864 (11th Cir. 2004). In this respect, of course, Rule 6 provides that the Court may extend a deadline "for good cause," even after the deadline has expired, if a party moves for an extension *and* shows that it "failed to act because of excusable neglect." FED. R. CIV. P. 6(b)(1)(B).

The parties agree that—were the Court to take up the choice-of-law question—Florida's choice-of-law rules would determine *which* state's substantive law applies to Ms. Goodnight's punitive-damages claim. *See* Motion at 1; Response at 8. In this respect at least, both parties are correct. *See Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013) ("In diversity cases, the choice-of-law rules of the forum state determine what law governs[.]"). For tort claims, Florida follows the "significant relationship test," which is set out in the Restatement (Second) of Conflict of Laws §§ 145–46 (1971). *See Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). Under that test, the Court must: (1) "identify the sovereigns with interests in applying their laws to the . . . dispute"; (2) determine whether there is a "true conflict" between the laws of the interested jurisdictions; and, if there is a conflict, (3) "determine which sovereign's interest is the most 'significant.'" *Salinero v. Johnson & Johnson*, 408 F. Supp. 3d 1354, 1356–57 (S.D. Fla. 2019).

Courts consider four types of contacts when comparing one state's interest to another's: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of

the parties; and (4) the place where the relationship, if any, between the parties is centered. *See Bishop*, 389 So. 2d at 1001 (quoting Restatement (Second) Conflict of Laws § 145(2)). A court should evaluate these contacts "according to their relative importance with respect to the particular issue." *Id.* (quoting Restatement (Second) Conflict of Laws § 145). But the first contact—the place of injury—is generally the most important. *See, e.g.*, *Brown Jordan Int'l, Inc. v. Carmicle*, 2016 WL 815827, at *47 (S.D. Fla. Mar. 2, 2016) ("The presumption of the significant relationship test is that generally the law of the forum where the injury occurred determines the substantive issues unless another state has a more compelling interest." (citing *Bishop*, 389 So. 2d at 1001)).

The Restatement also provides that, "[i]n an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 146. The "principles stated in § 6" include: (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the pertinent policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in the determination and application of the law to be applied. *See id.* § 6(2).

**ANALYSIS**

**I.    TIMELINESS**

The Motion is untimely because BSC filed it *six months after* the expiration of the Court's dispositive-motions deadline[5]—the very stage of the case at which, in the words of the Eleventh Circuit, "choice-of-law matter[ed]." *Sun Life Assurance*, 904 F.3d at 1208. And, although BSC cleverly gave the Motion a generic, innocuous title—"Choice of Law"—it's nothing more than a second motion for partial summary judgment. It, after all, asks the Court to enter judgment *as a matter of law* on a hotly disputed damages claim. *See* Motion at 4, 8 (arguing that there's "no dispute that [BSC] is headquartered in Massachusetts . . . where it made all the decisions regarding the design and warnings" of the Advantage Fit, and that under "Massachusetts law, punitive damages are not authorized"); *see also* FED. R. CIV. P. 56(a) (summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment *as a matter of law*" (emphasis added)). Summary judgment also happens to be the phase of the litigation at which BSC and other vaginal-mesh manufacturers have advanced this same argument in other cases. *See, e.g.*, *Salinero*, 408 F. Supp. 3d at 1355; *Hendricks*, 51 F. Supp. 3d at 639; *Sanchez*, 38 F. Supp. 3d at 730; *Adams*, 2015 WL 5882980, at *1; *Holizna*, 2015 WL 2452483, at *1; *Eghnayem*, 2014 WL 5386731, at *1.

District courts "enjoy broad discretion in deciding how best to manage the cases before them," *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997)—a discretion that extends to the decision in question here: whether to address an untimely choice-of-law (or summary-judgment) motion. *See, e.g.*, *Destra v. Demings*, 725 F. App'x 855, 859 (11th Cir. 2018)

---

[5] The deadline (again) was August 23, 2019. *See* Scheduling Order; Paperless Order Extending Summary-Judgment Deadline.

("Because [the] [d]efendants' motion for summary judgment was filed late without any explanation, the district court's initial decision to strike that motion was not an abuse of its discretion."); *Levin*, 459 F.3d at 72 (explaining that a court may reject a late-filed choice-of-law motion based on "the case's own facts and equities"). Whatever one calls this Motion, in other words, the Court may reject it as untimely.

The key point, though, is that BSC—whose briefs and proposed jury instructions (exclusively) pushed for the application of Florida law[6]—"seemed quite content early in the litigation with the application of Florida law." *Sun Life Assurance*, 904 F.3d at 1208–09. And, since it never—not even obliquely—referred to, or relied on, any other state's law, *both* the Court and Ms. Goodnight were "entitled to assume" that Florida law applied. *See id.* at 1208–09.[7]

Hoping to persuade the Court to ignore this thorny question of timeliness, BSC reiterates that a district court has "absolute discretion to consider a choice-of-law issue up to and even during trial"—a discretion that (BSC says) encompasses the power to extend any applicable deadlines. *See* Reply at 2. But BSC cannot (and does not) explain why it would be fair or appropriate for the Court to exercise its discretion in *this* case. Nor did BSC ever ask the Court to extend any deadline—whether "for good cause" or "excusable neglect." FED. R. CIV. P. 6(b)(1). Why not? Presumably because BSC has no viable excuse for its neglect. Both the facts and the law on which the Motion is premised were available to BSC from the outset of the case. Indeed, BSC knew of the two facts on which it principally relies—that its headquarters are in Massachusetts and that it made decisions regarding the Advantage Fit there, *see* Motion at 4—*long before* Ms. Goodnight

---

[6] *See generally* Motion to Dismiss; Motion for Summary Judgment; Motion to Bifurcate; Joint Proposed Jury Instructions.

[7] As *Sun Life Assurance* makes clear—in a way that directly contradicts BSC's position—the Court may reject the Motion *even if* BSC can show that it didn't "intentionally wait[]" to raise the issue in order to "gain an unfair advantage." Motion at 5.

ever filed her case. These facts, after all, formed the very gravamen of BSC's (rather identical) choice-of-law argument in *Eghnayem*—an argument it advanced in that case *six years* ago. *See* 2014 WL 5386731, at *5. And the remaining relevant details—such as Ms. Goodnight's state of residence, the state in which the product was implanted, the state in which she suffered her injuries, and the state in which her surgeries were performed (all Florida, by the way)—were pellucid from the face of the Complaint. *See* Complaint ¶¶ 2, 5, 52, 55. In this respect, BSC doesn't even purport to rely on some new or recently-unearthed fact.

Nor does BSC suggest that there was some change in the salient choice-of-law doctrine or some revision to Massachusetts's punitive-damages regime—either of which may have justified the late filing. Instead, BSC draws encouragement from Judge Ungaro's recent decision in *Salinero*, which held that New Jersey law governed certain Florida plaintiffs' punitive-damages claims against a New Jersey manufacturer of pelvic mesh. *See* Feb. 12, 2020 Hr'g Tr. [ECF No. 102] at 4:13–19 (BSC counsel explaining that, because she had only recently "learned of . . . the *Salinero* case," she "intend[ed] to file [this] [M]otion"). But *Salinero*—a district court decision— isn't binding here. And, for reasons we elaborate on below, it isn't even directly on point. To be fair, though, insofar as it stands for the proposition that a state in which a defective product was manufactured may have a strong interest in punishing its corporate citizens with punitive damages, *see* 408 F. Supp. 3d at 1357, *Salinero* does offer BSC *some* support. But, as far as timeliness goes, that general (and, if we're being candid, uncontroversial) proposition wasn't novel. Both BSC and Judge Ungaro relied on cases dating back to 2013 and 2014, *see id.* at 1357–58 (collecting cases); Motion at 3–4 (collecting cases), which in turn relied on decisions stretching as far back as the 1980s, *see In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 612 (7th Cir. 1981); *Dobelle v. Nat'l R.R. Passenger Corp.*, 628 F. Supp. 1518, 1528 (S.D.N.Y. 1986).

BSC, in short, could easily have filed this Motion without the benefit of *Salinero*. Indeed, it could have made the *exact same* legal and factual arguments it now advances when it moved for summary judgment in August 2019—just as it did six years ago in *Eghnayem*.[8]

Curiously, even as BSC appeals to the Court's discretion, it contends that the Court *must* grant the Motion because a district court "abuses its discretion if it fails to apply the correct law." Reply at 2 (quoting *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997)). This position need not detain us long. As we've established, it's well-settled in this and other circuits that, just as a party may stipulate to the application of a state's legal regime, a party may, through its briefing (or otherwise), waive its choice-of-law arguments implicitly—which is exactly what BSC did here. *See Sun Life Assurance*, 904 F.3d at 1208–09; *Shay*, 702 F.3d at 80; *Levin*, 459 F.3d at 72. In other words, in our adversarial system, a straightforward application of the waiver doctrine (or, as the case may be, a stipulation) sometimes determines what the "correct law" is. *See Wood*, 942 F.2d at 426–27 (noting that "[t]he question whether to honor a choice of law stipulation . . . is a pure question of procedure," and that "[c]ourts do not worry about conflict of laws unless the parties disagree on which state's law applies").

BSC provides no authority to the contrary. Instead, it lifts a truism about applying the "correct law" from a case that has nothing to do with choice of law—much less with the all-important question of whether a court *must* consider late-filed motions in like circumstances. In

---

[8] BSC says that, "in contrast to *Eghnayem*," it has now "provided plentiful authority establishing Massachusetts' superior interest" in the punitive-damages claim. *See* Reply at 8. Tellingly, BSC does not cite or list what those "plentiful" authorities are. *See generally id.* It certainly never cites any Eleventh Circuit or Supreme Court case for that proposition. Nor does it refer to a single *Massachusetts* case, statute, or legal document that it had not already offered in *Eghnayem*. In fact, BSC does not rely on any Massachusetts cases, statutes, or legal documents from after 2013. *See generally* Motion; Reply. So, again, BSC had all the information it needed to file this Motion by the Court's dispositive-motions deadline.

that case, *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997), the Ninth Circuit held that a district court had not abused its discretion by rejecting an "unclean hands" defense to a Lanham Act claim. There's a lot more to say about the case, but the problem is that none of it is remotely relevant here.

BSC does manage to cite one case—*Wilson v. Image Flooring, LLC*, 400 S.W.3d 386 (Mo. Ct. App. 2013)—that hints at a choice-of-law analysis. But, even if this Court were inclined to follow the pronouncements of a foreign state's appellate courts, *Wilson* doesn't help BSC because the defendant in that case (unlike BSC) timely raised its choice-of-law arguments in its *motion to dismiss*. *See id.* at 390. *Wilson* thus says absolutely nothing about the only salient issue here: whether a court *must* address the merits of a (very) untimely choice-of-law motion—a motion premised on neither new facts nor new law and filed long after the movant consistently advocated for the application of a *different* state's legal regime.

Having failed to excuse its delay (or, alternatively, to liken choice-of-law issues to questions of subject-matter jurisdiction, which cannot be waived), BSC unpersuasively tries to shift the burden to Ms. Goodnight to prove surprise and prejudice.

*First*, BSC says that Ms. Goodnight "cannot claim surprise" about the Motion's timing because, in its Answer, BSC "specifically preserved its right to assert any defenses to punitive damages claims under the law of the state determined to apply." Reply at 3; *see also* BSC's Answer to Plaintiff's Amended Complaint [ECF No. 11] at 20 (pleading "all defenses" and "all applicable statutory damages caps" under the laws of "each and every state with respect to any claims for punitive damages"). But BSC's boilerplate preservation language does not give it carte blanche to file motions or proffer new arguments *long* after the expiration of court-imposed deadlines— especially with respect to issues it easily could (and should) have raised earlier. *See Sun Life*

*Assurance*, 904 F.3d at 1209 (holding that "general references to a choice-of-law analysis in opposition to [the defendant's] dispositive motions" were insufficient to preclude waiver of a choice-of-law argument).

BSC also suggests that Ms. Goodnight couldn't have been surprised because "she dedicate[d] nearly a page of her Response to discussing other cases in which this very issue *was raised*." Reply at 3 (emphasis added). BSC's use of the passive voice notwithstanding, it cannot hide from the reality that *it* was the one raising "this very issue" in prior cases—and, therefore, that *it* has no excuse for its delay. The argument is also frivolous on its face. Ms. Goodnight cited those cases in *response* to the (late-filed) Motion, *see* Response at 4, so her citations (obviously) say nothing about what she knew before. For all we know, Ms. Goodnight may have had no idea that, while it was submitting one brief after another for the proposition that Florida law should govern this case, BSC actually believed that Massachusetts law precluded her punitive-damages claim.

But here's the point: Even if Ms. Goodnight had been aware of BSC's strategy in previous MDL cases, her awareness would still weigh strongly against BSC. Judge Goodwin, after all, *rejected* BSC's identical choice-of-law contentions vis-à-vis other Florida plaintiffs in this very same vaginal-mesh litigation. Ms. Goodnight would thus have been justified in supposing that the question was, as it were, settled. And, if[9] she harbored this intuition at the case's inception, that suspicion would have been reinforced as the litigation proceeded—*especially* after BSC (1) moved

---

[9] We say "if" only because we don't know what Ms. Goodnight would say on this issue. Why not? Because BSC only made its she-wasn't-surprised-so-no-harm-no-foul argument in its Reply—thus preventing Ms. Goodnight from responding to it. And, obviously, BSC's failure to advance this position in its initial Motion provides a separate and independent reason for disregarding it. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

to dismiss the original complaint's punitive-damages claim under Florida law, (2) declined to raise the choice-of-law argument at summary judgment, (3) briefed all other substantive and procedural questions under Florida law, (4) submitted a punitive-damages jury instruction that relied exclusively on Florida law, and (5) allowed the pre-trial motions deadlines to pass without ever raising the issue. In short, even if Ms. Goodnight had known of BSC's prior litigation strategy, BSC wasn't entitled to lull her into a false sense of security by avoiding the issue for over a year, only to spring it on her (and the Court) six months after the summary-judgment deadline expired.

*Second*, BSC maintains that the Motion won't prejudice Ms. Goodnight because, when it was filed, there were still two months left before trial.[10] But prejudice is beside the point *unless* BSC can demonstrate some cause for its delay—which, as we've said, it cannot do. The argument also fails on its own terms. If the Court were to grant the Motion now, as BSC requests, then Ms. Goodnight *would be* prejudiced—regardless of the trial date—because she never had an opportunity to take discovery on *any* of the salient choice-of-law factors. *Cf.* FED. R. CIV. P. 56(d) (permitting the court to extend discovery for a non-movant who, "for specified reasons, . . . cannot present facts essential to justify its opposition" at summary judgment). Nor would Ms. Goodnight have had a chance to amend her Complaint to assert a cause of action that complies with the strictures of MASS. GEN. LAWS Ch. 93A, which (BSC says) is necessary to sustain a punitive-damages claim under Massachusetts law. *See* Reply at 9.

In her Response, Ms. Goodnight does, in the alternative, request leave to amend. *See* Response at 16–19. But, in a remarkable example of someone who wants both to eat his cake and then to have it, too—or, better yet, someone who believes that what's good for the goose isn't quite

---

[10] For scheduling reasons—and, later, because of the ongoing COVID-19 pandemic—the Court has had to continue the trial date four times. *See* [ECF Nos. 91, 110, 114, 115].

good enough for the gander—BSC insouciantly tells the Court to deny that request as (wait for it!) *untimely*. *See* Reply at 9–10. *Chutzpah* doesn't quite begin to describe it. All of this is to say that, if BSC got its way, Ms. Goodnight *would be* severely prejudiced. The Court, after all, would be applying Massachusetts law *and then* preventing Ms. Goodnight from either amending her Complaint or conducting the discovery that might be necessary to comply with that law. That's no one's conception of equity.

*Third*, BSC contends that an order granting the Motion would promote "judicial economy" because it would foreclose the need for a second, punitive-damages phase of the trial. *See* Motion at 6. But that's like moving for summary judgment a second time—six months after the summary-judgment deadline—and then justifying the serial filing by pointing to the "judicial economies" that would be promoted by avoiding the trial altogether. Dismissals and summary judgments do, it's true, free up valuable time and resources. But judicial economy is not an end unto itself. Parties cannot be permitted to advance claim-dispositive arguments up until the day of trial—especially not arguments they long ago waived—simply because doing so might narrow, shorten, or even eliminate trials.

BSC's point about judicial economy and trial bifurcation is even less persuasive here, given that it moved to bifurcate the trial on December 20, 2019, *see* Motion to Bifurcate—and, in doing so, didn't so much as hint at a choice-of-law conflict. Had BSC timely moved for summary judgment on the punitive-damages claim, it could have foreclosed the need for any Motion to Bifurcate in the first place. By the same token, had BSC advanced this question earlier in the case—and won—it could have circumscribed both the scope of the trial *and* its own liability. That delimiting of liability, in turn, may have facilitated settlement and, by extension, *truly* "promoted" judicial economy. *See Solbourne Computer, Inc. v. Bd. of Cty. Commissioners of Escambia Cty.,*

*Fla.*, 2008 WL 1744930, at *3 n.2 (N.D. Fla. Apr. 11, 2008) ("[S]ettlements are, of course, favored under the law because they help avoid the costs of litigation and, *inter alia*, help serve the interests of judicial economy."); *see also In re Air Crash Disaster at Sioux City, Iowa, on July 19, 1989*, 734 F. Supp. 1425, 1429 (N.D. Ill. 1990) ("The choice of law question regarding punitive damages should be resolved as early as possible. First and foremost, this determination may facilitate settlement negotiations and thus enable victims of the crash to be compensated expeditiously.").

Now, by contrast, if the Court were inclined to grant BSC's Motion, it would—in the interests of justice—also grant Ms. Goodnight's request for leave to amend. *See* FED. R. CIV. P. 15(a)(2) (directing courts to "freely give leave" to amend a pleading "when justice so requires"). An order granting the Motion would thus require the Court to reopen the pleadings, extend discovery, and allow re-briefing—setting the schedule back several months (at least). It's hard to imagine something "promoting" judicial economy less.

*** 

In sum, after more than a year of litigation—in which it consistently and repeatedly argued for the application of Florida law—BSC has no excuse for its untimely Motion. Both the facts and the law on which its Motion is premised were available to BSC from the outset of the case, and it hasn't even tried to offer some other justification for its tardiness. Nor would an order granting the Motion provide litigants with anything resembling the proper incentives. Dismissing Ms. Goodnight's punitive-damages claim *in these circumstances* would encourage future litigants to ignore court-imposed deadlines, only to pick off valuable claims on the eve of trial, using "choice of law" as a Trojan Horse for never-ending rounds of summary judgment. This the Court will not allow.

The Court wouldn't be inclined to allow a motion that is this late—on these or similar facts—even for a *pro se* litigant. And it certainly won't do so for a publicly-traded pharmaceutical company represented by one of the most sophisticated law firms in the country. The Motion is, for all these reasons, **DENIED**.

## II.    THE MERITS

Even if BSC had filed its Motion on time, the Court would have denied it anyway, because, while BSC may satisfy the first two steps of the "significant relationship" test, it falls short *on the merits* precisely where it fell short in *Eghnayem*: It simply cannot show that Massachusetts has a more significant interest in the punitive-damages claim than Florida does.[11]

As a preliminary matter, Judge Goodwin issued his decision—that BSC failed to establish the superiority of Massachusetts's interest—while presiding over the MDL with which this case is most closely associated. And the very purpose of consolidating these vaginal-mesh cases into an

---

[11] The Court here assumes that (1) both Florida and Massachusetts have potential interests in the case, and (2) the two states' laws would lead to a "true conflict"—i.e., a different outcome—on the question of punitive damages. *See Salinero*, 408 F. Supp. 3d at 1356–57 (describing the three-part "significant relationship" test). These appear to be safe assumptions. *First*, given the history of these proceedings, the parties' briefing under Florida law, and Ms. Goodnight's residency and implantation in Florida, the State of Florida plainly has an interest in punishing BSC for its (alleged) misconduct. And, as Judge Goodwin concluded in *Eghnayem*, "the facts also implicate the laws of the Commonwealth of Massachusetts" because that's where BSC is headquartered. *See* 2014 WL 5386731, at *3; *see also Judge v. Am. Motors Co.*, 908 F.2d 1565, 1569 & n.3 (11th Cir. 1990) (explaining that states have an interest in deterring the tortious conduct of their corporate residents). *Second*, because Ms. Goodnight has neither asserted a claim under Massachusetts's consumer-protection law nor sent a pre-suit demand letter, her punitive-damages claim—which would survive in Florida—would be barred in Massachusetts. *Compare Flesner*, 575 N.E.2d at 1112 (permitting punitive damages only as authorized by statute) *and* MASS. GEN. LAWS ANN. Ch. 93A, § 9(3) (requiring a pre-suit demand letter), *with* Reply at 8–9 (BSC conceding that "Florida law permits [Ms. Goodnight] to pursue punitive damages for the personal injury claims asserted in her [ ] Complaint"). The Court, to be clear, acknowledges Ms. Goodnight's position that there really is no "true conflict" because, if the Motion were granted, she would seek to amend her Complaint and send the necessary demand letter. *See* Response at 12–13. But, because the Court is denying the Motion anyway, the Court need not separately determine whether there *would be* a "true conflict" if she took the steps she proposes to take.

MDL, and then transferring that MDL to one judge, was "to eliminate the potential for inconsistent rulings on common issues." *In re Am. Med. Sys., Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 844 F. Supp. 2d at 1360; *see also In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491–92 (J.P.M.L. 1968) (noting that an MDL's "remedial aim is to eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions"). That decision, in other words, gets added weight. Indeed, there's no better evidence of the added weight Judge Goodwin's prior decisions in this MDL should be afforded than BSC's own (consistent) reliance on many of those prior decisions. *See generally* Omnibus *Daubert* Motion (citing several evidentiary orders from MDL 2326); Motion to Bifurcate at 2 (citing one of Judge Goodwin's orders from *Eghnayem* in support of its argument to bifurcate the trial). And so, given that BSC's Motion has adduced no new facts or binding legal authorities, BSC faces a steep uphill battle in its assault on Judge Goodwin's well-reasoned decision in *Eghnayem*.

Turning to *Eghnayem*, Judge Goodwin evaluated the factors set out in the Restatement, §§ 6 & 145, and concluded as follows:

*First*, as to § 145, he found that, "[a]s it concerns the issue of punitive damages, the relationship between the parties is not centered in Massachusetts. Instead, it is centered in Florida, where BSC distributes products, the plaintiffs reside, the plaintiffs were implanted with BSC products, and the plaintiffs allegedly suffered injury." *Eghnayem*, 2014 WL 5386731, at *4. These facts are no less true here, and BSC doesn't suggest otherwise. This first factor, then, favors Florida law.

*Second*, with respect to the factors outlined in § 6—particularly "the relevant policies of the forum"—Florida's interest is easy to identify, because it has unambiguously declared that it uses punitive damages to punish and deter companies that injure its citizens. *See id.* at *4 (quoting

*Owens–Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483, 486 (Fla. 1999), for the proposition that, "[u]nder Florida law, the purpose of punitive damages is . . . to punish the defendant for its wrongful conduct and to deter similar misconduct by it and other actors in the future"). BSC has made no attempt to diminish (or undermine) Florida's powerful interest in applying its law to Ms. Goodnight's punitive-damages claim.[12]

At the same time, however, BSC fails even to articulate the precise nature of Massachusetts's interest in applying its punitive-damages rules to this case—much less to show that Massachusetts's interest is somehow greater than Florida's. As Judge Goodwin put it:

> BSC contends that Massachusetts has an interest in protecting its citizens from excessive financial liability. BSC is a Delaware Corporation with its principle [sic] place of business in Massachusetts. . . . BSC points to no Massachusetts legal authority supporting its proposition that Massachusetts has an interest in protecting its citizens from excessive liability, let alone liability for wrongs occurring outside of Massachusetts. Likewise, I am unable to locate any Massachusetts cases articulating the state's interest in prohibiting punitive damages at common law. . . . Even assuming Massachusetts's punitive damages prohibition is based on a policy of shielding its residents from excessive liability, Massachusetts has no legitimate interest in enforcing this policy outside of its borders.

*Id*. at *4 (quoting *Sanchez*, 38 F. Supp. 3d at 739–40).

As in *Eghnayem*, BSC wholly fails to explain the policy rationales that underlie the Massachusetts rules it here asks the Court to enforce—rules like requiring punitive-damages plaintiffs (1) to assert a statutory (rather than a common-law) cause of action and (2) to send their

---

[12] Indeed, BSC at one point cites to *Judge*, 908 F.2d at 1566, a case in which Florida residents, while travelling in Mexico, crashed a car manufactured by an automaker headquartered in Michigan. There, the Eleventh Circuit found that Florida's compensatory- and punitive-damages rules—which "afford survivors a vehicle through which they can shift the burden of loss from themselves to the wrongdoer"—would be "significantly furthered" if applied in that case. *See id.* at 1570. The court therefore concluded that "section 6(2)(b) [of the Restatement] militates 'weightily' in favor of Florida law." *Id.* Likewise, here, Florida's compelling policy interest in deterring foreign companies from injuring its residents would be "significantly furthered" if a Florida jury—rather than some distant Massachusetts legislature—were permitted to assess the strength and scale of Ms. Goodnight's punitive-damages claim.

adversaries a pre-suit demand letter. As the Restatement explains, "the interest of a state in having its tort rule applied in the determination of a particular issue will depend upon the *purpose sought to be achieved by that rule* and by the relation of the state to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 145 cmt. c (emphasis added). But, as the Court's examples make plain, Massachusetts's rules don't impose either substantive prohibitions or liability caps on punitive damages; instead, they function as quasi-procedural rules that—at least on their face—neither protect *nor* punish anyone. So, without any Massachusetts authorities on point, this Court—like Judge Goodwin—cannot discern (nor should the Court be compelled to divine) the specific policy interests that the application of these two rules might advance.

In *Eghnayem*, BSC tried to argue—without support—that these two Massachusetts rules evinced an *express* policy of protecting or shielding corporate citizens from excessive liability. *See* 2014 WL 5386731, at *4. In its Reply here, BSC offers the same point: "Massachusetts *protects* its citizens, including its manufacturers, from punitive damages under common law." Reply at 6 (emphasis added). To prop up this view, BSC cites *Int'l Fid. Ins. Co. v. Wilson*, 443 N.E.2d 1308, 1317 n.20 (Mass. 1983). *See* Reply at 6. But *Wilson* says only that, "[u]nder Massachusetts law, punitive damages may be awarded only by statute." As Judge Goodwin already pointed out in *Sanchez*, BSC's authorities (including *Wilson*) "simply restate[] the Massachusetts rule *without providing an explanation of the policy behind it*." 38 F. Supp. 3d at 739 (emphasis added). And while it's true that Massachusetts requires punitive-damages plaintiffs to levy a statutory cause of action, that truism simply begs the question presented here: whether the Commonwealth has some *general policy* of protectionism that would be advanced by an *extra-territorial* application of its rules. As Judge Goodwin explained, whatever interest the Massachusetts legislature expressed in protecting its citizens from common-law punitive damages, nothing in the relevant statutory

architecture suggests that we should construe that protection as extending beyond the Commonwealth's borders.

To be fair, BSC also cites *Freeman v. World Airways, Inc.*, 596 F. Supp. 841, 846 (D. Mass. 1984), in which the district court did acknowledge that prohibitions on punitive damages are generally intended "to protect defendants from excessive liability and thus to encourage businesses to locate and conduct economic affairs in the jurisdiction." *Id.* In that case, however— unlike here—Massachusetts was "the place of injury [and] also the location of most of [the defendant's] alleged negligent conduct and other conditions that contributed to the cause of the plane crash." *Id.* at 846. Thus, because the § 145 contacts strongly favored the application of Massachusetts law, it was up to the plaintiffs to "show that another jurisdiction has a more significant interest." *Id.* at 847. Here, by contrast, the injury occurred in Florida, because of which BSC must show that some other state's laws are more suitable. *See Brown Jordan Int'l, Inc.*, 2016 WL 815827, at *47; Restatement (Second) of Conflict of Laws § 146. And, again, because BSC has failed to articulate what precisely Massachusetts's policy goals are with respect to the two specific punitive-damages rules at issue here, it cannot overcome the presumption in favor of Florida law.[13]

---

[13]     Along these lines, the two Michigan-law cases BSC cites are inapposite because, in barring punitive damages altogether for the types of claims at issue there, Michigan had expressly defined its general policy objectives. *See Judge*, 908 F.2d at 1570–71 (acknowledging the "several policy considerations" that undergird Michigan's damages regime, such as "the economic desire to encourage socially useful enterprise by relieving entrepreneurs from what the legislature regards as an oppressive risk of liability" (internal quotation marks omitted) (citing *Jackovich v. Gen. Adjustment Bureau, Inc.*, 326 N.W.2d 458, 464 (1982)); *see also Sergeon v. Gen. Motors Corp.*, 2005 WL 1711093, at *4 (M.D. Fla. July 20, 2005) ("Michigan law, which bars punitive damages, must be applied to this case[.]").

Nor, in any event, do the *holdings* of these cases support BSC. So, for instance, in *Judge*, the Eleventh Circuit remanded for further conflicts-of-law analysis; it did not, as BSC suggests, hold that Michigan law trumped Florida law. *See Judge*, 908 F.2d at 1575. And, in *Sergeon*, the plaintiffs—who lived in Florida and filed suit here—were injured in New Hampshire by a car

Recognizing (perhaps) the force of Judge Goodwin's objections, BSC's Motion takes a new (and perhaps contradictory) approach. It relies on several cases—such as *Salinero*—in which courts have held that non-forum states have compelling interests both in *punishing* their own corporate citizens and in *deterring* wrongful conduct, even where (as here) the plaintiffs reside, or are injured in, the forum state. *See* Motion at 2–3 (collecting cases). The implication is that Massachusetts's interest in punishing BSC is likewise stronger than Florida's. But there are two main problems with this argument.

*First*, based on its (rather selective) citations and quotations, BSC appears to advocate a categorical rule in which "punitive damages are governed by the law of the state where the defendant was headquartered and made its decisions concerning the design, labeling, marketing, and distribution of the product." *Id.* at 1. But neither the Eleventh Circuit nor the Supreme Court has adopted such a rule,[14] and the district court cases on which BSC don't stand for that proposition either. To the contrary, most of the cases BSC cites turned on the fact—not present here—that the

_____

designed in Michigan. *See* 2005 WL 1711093, at *4. Because (unlike here) Florida had only minor contacts to the dispute, the choice-of-law inquiry compared the interests of New Hampshire and Michigan—two non-forum states whose laws did not conflict. *See id.* ("Both Michigan and New Hampshire laws bar punitive damages in products liability cases, so the end result would be the same regardless of the forum the Court selected.").

[14] In fact, the Eleventh Circuit's opinion in *Judge* can be read to *reject* such a categorical rule. Again, in that case, Florida residents had crashed a Michigan vehicle while on vacation in Mexico. *See Judge*, 908 F.2d at 1566. If BSC were correct that "punitive damages are governed by the law of the state where the defendant was headquartered and made its decisions concerning the design, labeling, marketing, and distribution of the product," then the Eleventh Circuit would have just (automatically) applied Michigan law. But that's not what happened. As we've explained, the *Judge* Court remanded the case for the district court to conduct an additional, more fact-intensive choice-of-law analysis. *See id.* at 1575; *cf. Webber v. Nat'l Gen. Assurance Co.*, 2016 WL 3548820, at *1 (N.D. Fla. Feb. 29, 2016) (noting that, "although it may be true that a state in which a corporate entity resides or a state in which its agents perform tortious acts has a great interest in deterring such behavior, *any* state in which the entity does business and hurts customers also has an interest, though perhaps a diminished one, in deterrence").

non-forum states had enunciated (and codified) certain specific policy objectives which their punitive-damages regimes were intended to facilitate.

In *Salinero*, for example, the plaintiffs were from Florida, but the defendant had manufactured the allegedly defective product in New Jersey. *See* 408 F. Supp. 3d at 1357 ("Here, New Jersey law and Florida law provide a true conflict as to the applicable punitive damages caps."). Weighing the two states' interests, the Court ultimately applied New Jersey law to the plaintiff's punitive-damages claim. In so doing, the Court relied on *Krause v. Novartis Pharm. Corps.*, 926 F. Supp. 1306 (N.D. Fla. 2013), which had noted that "[t]he *express purpose* of punitive damages in New Jersey is 'to punish the defendant and to deter that defendant from repeating such conduct[.]" *Id.* at 1310 (emphasis added) (quoting N.J. STAT. ANN. § 2A:15–5.14(a)). The court in *Krause* also explained that the outcome was "consistent with commentary of the Restatement, which instructs, 'when the *primary purpose* of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance." *Id.* at 1312 (emphasis added) (quoting Restatement (Second) Conflict of Laws § 145, cmt. e).[15] But, again,

---

[15]   BSC points to other products-liability cases involving New Jersey manufacturers—several of which rely on *Krause* and are, for that reason, inapposite here. *See* Motion at 4 (citing *Kirchman v. Novartis Pharm. Corp.*, 2014 WL 2722483, at *4 (M.D. Fla. June 16, 2014); *Dopson-Troutt v. Novartis Pharm. Corp.*, 2013 WL 3808205, at *4 (M.D. Fla. July 22, 2013); *Guenther v. Novartis Pharm. Corp.*, 2013 WL 1225391, at *2 (M.D. Fla. Mar. 27, 2013); and *Chiles v. Novartis Pharm. Corp.*, 923 F. Supp. 2d 1330, 1333 (M.D. Fla. 2013)). BSC also cites to two cases from another transvaginal-mesh MDL in front of Judge Goodwin—both filed against a New Jersey manufacturer. *See* Reply at 3 n.2 (citing *Bellew v. Ethicon, Inc.*, 2014 WL 6674433, at *2 (S.D. W. Va. Nov. 24, 2014); and *Lewis v. Ethicon, Inc. (In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.)*, 2014 WL 186869, at *9–10 (S.D. W. Va. Jan. 15, 2014), *rev'd in part on other grounds*, 2014 WL 457551 (S.D. W. Va. Feb. 3, 2014)). But neither helps BSC very much because the plaintiffs in both cases "implicitly accept[ed]" that New Jersey law applied to their punitive-damages claims. *Bellew*, 2014 WL 6674433, at *2; *Lewis*, 2014 WL 186869, at *9 ("Although the plaintiffs expressly claim that they do not 'concede that New Jersey's' law applies, they appear to assume that it does, and they do not assert that the law of any other state applies to their punitive damages claim."). Ms. Goodnight, needless to say, makes no such concession.

even if punitive damages are *generally* intended to deter or punish, BSC has offered no Massachusetts authority for the proposition that the two specific rules at issue here were designed to deter or punish misconduct—let alone that they were designed to apply extra-territorially. And so, BSC hasn't met its burden of showing that those two rules have any "peculiar significance" to this case.

*Second*, and perhaps more fundamentally, BSC relies on Massachusetts law to *avoid* the punishment of punitive damages altogether. *See* Motion at 8 ("[A]pplying Massachusetts law, punitive damages are not authorized in this case."). But, if BSC is right that the two Massachusetts rules at issue here were designed to punish and deter wrongdoing, an order granting BSC's Motion would significantly undermine, rather than advance, that general policy goal. In BSC's preferred scenario, after all, application of Massachusetts's rules would allow BSC to evade punishment (at least in the retributive sense contemplated by *punitive* damages). To deter and punish, however, one must (at least) leave open the possibility of punishment.

***

---

Finally, BSC relies on two cases—both in front of Judge Walker in the Northern District of Florida—involving a conflict between the laws of Florida and Tennessee. *See* Motion at 3–4; Reply at 7. But, in those cases, the court acknowledged Tennessee's explicit policy on punitive damages. *See Webber v. Nat'l Gen. Assurance Co.*, 2016 WL 3548820, at *1 (N.D. Fla. Feb. 29, 2016) ("Under Tennessee law, '[p]unitive damages are . . . appropriate only in the most egregious cases.'" (quoting *Goff v. Elmo Greer & Sons Constr. Co., Inc.*, 297 S.W.3d 175, 187 (Tenn. 2009)); *accord Davis v. Main St. Family Pharmacy, LLC*, 2017 WL 3597509, at *3 (N.D. Fla. Apr. 4, 2017). And neither case established (or purported to apply) anything like a categorical rule; instead, Judge Walker conducted the flexible, factor-based analysis contemplated in the Restatement, considering (among other things) the fora's documented policy objectives and the locus of the salient events. *See Webber*, 2016 WL 3548820, at *1–2 (affording significance both to the place where the injury occurred and the fact that "individuals allegedly performing negligent acts and omissions . . . were located in a number of different states," and concluding that "no other single state has an interest in deterrence that outweighs Tennessee's"); *Davis*, 2017 WL 3597509, at *2 (noting that the facts and circumstances of the case made the inquiry "a close call").

Because BSC has failed to show that Judge Goodwin's resolution of this same issue in *Eghnayem* was wrong, its Motion would be **DENIED** even if it had been timely.

### CONCLUSION

For the foregoing reasons, the Motion [ECF No. 100] is **DENIED**. Florida law shall govern the Plaintiff's punitive-damages claim (Count V). The Plaintiff's request for leave to amend the Complaint, *see* Response [ECF No. 103] at 16–19, is **DENIED as moot**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 23rd day of November 2020.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record